UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

   -v.-                           :          13 Cr. 157 (KMK)

LAWRENCE MULQUEEN,                :

              Defendant.     :

- - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF THE UNITED STATES OF AMERICA IN RESPONSE TO
SENTENCING MEMORANDUM OF DEFENDANT LAWRENCE MULQUEEN**

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

ILAN GRAFF
Assistant United States Attorney
    -Of Counsel-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA         :

   -v.-                          :            13 Cr. 157 (KMK)

LAWRENCE MULQUEEN,               :

            Defendant.         :

- - - - - - - - - - - - - - - - - - x

### MEMORANDUM OF THE UNITED STATES OF AMERICA IN RESPONSE TO SENTENCING MEMORANDUM OF DEFENDANT LAWRENCE MULQUEEN

The defendant, Lawrence Mulqueen, is scheduled to be sentenced in the above-captioned case on October 16, 2013, at 2:00 p.m. The Government respectfully submits this memorandum in advance of that sentencing and in response to the defendant's sentencing memorandum dated October 4, 2013. The defendant urges the Court to impose a sentence of one year and one day, which is below the United States Sentencing Guidelines ("Guidelines") range of 15-21 months' imprisonment calculated by the United States Probation Office and set forth in the Presentence Investigation Report ("PSR").[1] The Government respectfully submits that a Guidelines sentence, consistent with the defendant's plea agreement (the "Agreement"), is appropriate here, as it would address the seriousness of the defendant's incendiary threats to murder public officials and others, deter further misconduct by the defendant, and promote respect for the law.

### BACKGROUND

**A.     The Offense Conduct**

On May 28, 2013, the defendant pled guilty to a two-count Indictment. Count One charged him with threatening to assault, kidnap, and murder United States officials to impede,

---

[1] As discussed in greater below, the PSR's Guidelines calculation differs from the 12-18 month Guidelines Range stipulated in the Agreement. Though the Government does not doubt the veracity of the Probation Office's assessment, it stands by the Stipulated Guidelines Range laid out in the Agreement.

intimidate, and interfere with those officials while they were engaged in the performance of their official duties, and to retaliate against those officials on account of their performance of official duties during their terms of service, in violation of 18 United States Codes Section 115(a)(1)(B). Count Two charged him with transmitting a threat in interstate commerce to kill federal, state, and local elected officials, and others.

      The threatening messages were posted to the defendant's Facebook social media page (the "Mulqueen Page") over a period of several days in February 2013.  (PSR ¶ 9).  As described in the Complaint on which the defendant was arrested, law enforcement became aware of the threats after another individual ("Victim-1") reported that the defendant maintained the Mulqueen Page and had posted messages about Victim-1, including at least one message encouraging others to harass Victim-1.  Victim-1 also informed law enforcement that the defendant had posted threats against elected officials on the Mulqueen Page.  Law enforcement officers reviewed the contents of the page and determined that Victim-1's report was accurate.  Among other things, the posted threats included the following:

    i. On or about February 19, 2013, the defendant posted: "I cannot wait to start killing the scum that is [a Governor], [a United States Senator], [a Mayor], [a United States Senator], [a United States Congressman], [a United States Congresswoman], [a United States Congresswoman], [a United States Senator], [a United States Congresswoman], [a United States Senator] and every Congressional Black Caucus member there is of these fucking racist niggers.  Your time is about up scumbags.  your dirt nap is coming very soon." (PSR ¶ 9A).

    ii. On or about that same day, the defendant posted the following comment on his earlier post: "I want these scumbags DEAD!!!  That traitor scum, Obama subserviant eunichs, fuck them and death to them all." (PSR ¶ 9B)

    iii. Shortly thereafter, in response to a commenter's assertion "Ya know where I stand brutha!!," the defendant posted that the commenter "better have a high powered rifle," as the commenter would "be needing it."  The defendant proceeded to explain: "I recommend a Binelli, a semi-automatic shotgun, it is an Italian made shotgun, very light and as I said semi-automatic, no need to pump or reload, it fires one round after another.  Expensive though, but worth it, better than a Remington 870."  As the

            PSR notes, "Benelli" is the name of an Italian-manufactured shotgun and the "Remington 870" is a shotgun that is commonly used by law enforcement. (PSR ¶ 9C).

iv.     Approximately eight hours later, the defendant posted: "The first wave to protect against is the inner city scum, do all you can to waste these lowlifes but be mindful of your ammo. Use blades when you can to conserve bullets. Always shoot them at 100 yards or more when you can, the further away they are the least you have to worry about." (PSR ¶ 9D).

v.      On or about February 19, 2013, the defendant posted "Support your Sheriff, for he is the highest law enforcer in all the land. Your Sheriff can arrest the POTUS and detain or kill ANY federal agent as he sees fit." (PSR ¶ 9G).

vi.     On or about February 20, 2013, the defendant posted a video about a race-related training seminar conducted at the United States Department of Agriculture, and commented, in part, "Anyone who comes across or encounters this La Raza SPIC is commanded to KILL him and send him to hell as is where he should be sent. Don't stop there either, KILL ALL these Mexican, El Salvadoran and Guatemalan scumbags where you see them . . ." A case agent reviewed the linked video and determined that "La Raza SPIC" referred to the individual who conducted the training seminar. (PSR ¶ 9E).

vii.    Also on or about February 20, 2013, the defendant posted, in part, "If anyone has the access to that scumbag [a political activist] and his whore wife [the activist's wife] please KILL them ASAP. I believe they reside in Chicago….find them and kill them." The case agent determined that the identified political activist lived in or around Chicago, Illinois. (PSR ¶ 9F).

After a search of the defendant's home pursuant to a state-court issued search warrant yielded two rifles, bayonets, ammunition, brass knuckles, and other weapons, the defendant was arrested by state authorities on February 21, 2013 and charged with criminal possession of a weapon in the third degree (that charge is still pending, see PSR ¶ 46). Shortly thereafter, he was charged federally in a two-count Complaint and was indicted on those same two counts on or about March 7, 2013. (PSR ¶ 1). In late May 2013, the defendant pleaded guilty before Your Honor, pursuant to the Agreement.

### B.     The Defendant's Criminal History and the Agreement

The defendant, who is 50 years old, has previously been convicted of multiple crimes, including trespass, attempted possession of stolen property, and numerous instances of driving while under the influence of alcohol.  (PSR ¶¶ 27-44).  The defendant's criminal history includes a conviction for Criminal Contempt in June 1999, which the PSR notes resulted from his failure to abide by an order of protection prohibiting him from approaching a particular woman ("Victim-2").  (PSR ¶ 36).  As particularly relevant here, the PSR reports that the defendant left a threatening message on Victim-2's answering machine in April 1998, in which he stated, among other things, that he would "cut [her] fucking throat," "kill [her] and [her] fucking family," and "kill 10 cops standing in front of [her] to strangle [her]."[2]  (PSR ¶ 36).

Two of the defendant's prior convictions are assigned criminal history points under the Sentencing Guidelines.  The first, a January 2007 felony conviction for Driving While Intoxicated resulted in a sentence of five years' probation.  (PSR ¶ 40).  The second, an August 2009 misdemeanor conviction for Criminal Possession of a Weapon in the Fourth Degree, stemmed from an incident in which the defendant was found intoxicated in Nyack, New York, wearing a bullet proof vest and carrying a large gravity knife in his right front pocket.  (PSR ¶¶ 43-44).  That offense resulted in a conditional discharge.  (PSR ¶ 43).  Together, these two offenses yield a total of two criminal history points.

Notably, the defendant's 2009 conviction did not appear on the Government's version of the defendant's criminal history report, which was produced to the defendant in discovery.  As a result, it was not included in the Agreement's calculation of the defendant's Guidelines Range, which erroneously placed the defendant in criminal history category I rather than criminal history category II.  (PSR ¶ 106).  The resulting difference in the defendant's criminal history

---

[2] It appears that that the charge arising out of this conduct was ultimately dismissed in connection with the defendant's guilty plea to the trespass offense.  (PSR ¶ 50).

category yielded a disparity between the Agreement's stipulated Guidelines Range of 12-18 months and PSR's Guidelines Range of 15-21 months. (Id.). The Government does not doubt the Probation Department's information and the defendant has not disputed the existence of the 2009 conviction. Nevertheless, the Government stands by the Agreement and notes that the Probation Department has recommended a sentence (15 months) which falls within both the Agreement and the PSR's Guidelines Range.

## DISCUSSION

### A. A Guidelines Sentence Is Necessary to Address the Seriousness of the Defendant's Threats, Deter Further Misconduct, and Promote Respect for the Law

The defendant posted a series of epithet-laden death threats to an online forum, and responded to readers' comments by detailing specific ways in which his incendiary statements might be put into action. The defendant cites his abusive childhood, work ethic, and health issues, including struggles with alcoholism, as factors militating in favor of a below Guidelines sentence (Deft. Sub. at 9-11). All of these are relevant factors for the Court's consideration under 18 U.S.C. Section 3553. However, the Government submits that a Guidelines sentence is warranted and would reflect the seriousness of the defendant's actions, deter him from further misconduct, and promote respect for the law. See 18 U.S.C. § 3553(a).

The Government shares the Probation Department's view that the defendant's conduct "should not be taken lightly." (PSR at 31). The defendant's postings speak for themselves with respect to the gravity of his offense. His fervent exhortations to readers to "find . . . and kill" a political activist or "KILL ALL these Mexican, El Salvadoran and Guatemalan scumbags where you see them," among many other chilling statements, are sharply at odds with his insistence that he did not intend harm to anyone (which, in any event, is not an element of the offenses of conviction). Moreover, regardless of the defendant's intentions, his lethal threats against elected

officials and others, coupled with specific guidance as to which firearm might most efficiently slaughter federal and local representatives, courted tragedy—as these statements could well have spurred readers to disastrous action (a troubling reality that is reflected in the defendant's Guideline enhancement for sending a communication that "created a substantial risk of inciting others to violence," PSR ¶ 16).  The defendant attributes his threatening posts to a period of intoxication over several days (Deft. Sub. at 10)—and the defendant's alcoholism may well have been a contributing factor.  However, information obtained from Facebook and produced to the defendant in discovery reveals a lengthy history of similar postings, which extends well before the offense conduct.  For instance, the defendant's online posts in the year preceding the offenses of conviction included the following:

- "If Americas traditions offend YOU, then leave NOW while you still have your wretched, miserable, GODLESS lives. For the time is here for the sterilization and annihilation of you and your evil.  The Restoration of our once proud Republic is coming soon and if it kills us all, you leftist/liberals will be found. You are a CANCER and VIRUS so worthy of extinction no mountain will hide you, no gun will protect you and you scum will be wiped from GOD's earth forever." (Posted March 24, 2012)

- "The UN-CONSTITUTIONAL REGIME in our White House AND elsewhere is stockpiling the MERCENARIES (Foreign Troops) to bring war to American citizens HERE. Arm yourselves the S.W.H.T.F. soon. You won't know American troops from Russian. So don't hesitate to shoot ANYONE who comes armed against you. An American in uniform against the Constitution is as much an enemy as the rest." (Posted May 9, 2012)

- "This is the Obamination currently occupying the House of The People. I will not rest nor be satisfied until HE and this whole FEDGOV Administration along with ALL those who support them, are swinging from a noose, shot, burned and their gene pool annihilated off the face of the earth." (Posted October 24, 2012)

In short, the threatening language deployed in the defendant's February posts was not an isolated event.  To the contrary, the specter of imminent violence has been a recurring feature of the defendant's Internet communications for some time.

By the same token, this is far from the defendant's first offense—or even the first time that he has made specific, highly charged threats to someone's life (see PSR ¶ 36).  Though

many of the defendant's past convictions are for comparatively minor offenses, they illustrate his troubling penchant for reckless behavior, affinity for weapons, and the failure of past, lenient sentences to deter further misconduct. A Guidelines Sentence would hopefully prove a more effective deterrent. Such a sentence would also offer general deterrence to similarly situated individuals and promote respect for the law by demonstrating that the comparative anonymity and distance provided by online discourse is not a license to invite violent, murderous behavior.

## CONCLUSION

      For the reasons set forth above, the Government respectfully submits that a Guidelines sentence is appropriate here.

      Respectfully submitted,

      PREET BHARARA
      United States Attorney

By:  /s Ilan Graff
      Ilan T. Graff
      Assistant United States Attorney
      (914) 993-1967

Dated: October 15, 2013
      White Plains, New York

cc: Jason Ser, Esq. (by ECF and hand)